AO 440  (Rev. 05/00) Summons in a Civil Action

# United States District Court
## Northern District of Illinois

### SUMMONS IN A CIVIL CASE

MICHAEL BLAKE, individually and on behalf
of similarly situated individuals,

V.

CELEBRITY HOME LOANS, LLC, an Illinois
limited liability company, and CELEBRITY
FINANCIAL, INC., a U.S. Virgin Islands corporation.

CASE NUMBER:  1:23-cv-01839

ASSIGNED JUDGE:  Honorable Sara L. Ellis

DESIGNATED
MAGISTRATE JUDGE:  Honorable Jeffrey T. Gilbert

TO: (Name and address of Defendant)

Celebrity Financial, Inc.
c/o Marjorie Rawls Roberts, P.C.
5093 Dronningens Gade, Ste. 1
St. Thomas, VI 00802

*Magnelled Phit*
*12:03 PM*
*4/20/2023*

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Paul T. Geske
McGuire Law, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601

an answer to the complaint which is herewith served upon you, _____ 21 _____ days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a reasonable
period of time after service.

THOMAS G. BRUTON, CLERK

(By) DEPUTY CLERK

April 19,  2023

DATE

Ex. A

AO 440 (Rev. 05/00) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| | TITLE |
|---|---|
| NAME OF SERVER *(PRINT)* | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☐ Other (specify): _____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
Date                                         *Signature of Server*

_____
*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440  (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

**SUMMONS IN A CIVIL CASE**

MICHAEL BLAKE, individually and on behalf
of similarly situated individuals,

V.

CELEBRITY HOME LOANS, LLC, an Illinois
limited liability company, and CELEBRITY
FINANCIAL, INC., a U.S. Virgin Islands corporation.

CASE NUMBER:     1:23-cv-01839

ASSIGNED JUDGE:     Honorable Sara L. Ellis

DESIGNATED
MAGISTRATE JUDGE:   Honorable Jeffrey T. Gilbert

TO: (Name and address of Defendant)

Celebrity Financial, Inc.
c/o Marjorie Rawls Roberts, P.C.
5093 Dronningens Gade, Ste. 1
St. Thomas, VI 00802

*Marjorie Rawls Robert*
*4/20/2023*
*12:03 PM*

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Paul T. Geske
McGuire Law, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601

an answer to the complaint which is herewith served upon you, _____ 21 _____ days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a reasonable
period of time after service.

THOMAS G. BRUTON, CLERK

(By) DEPUTY CLERK

April 19,  2023

DATE

AO 440  (Rev. 05/00)  Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served: _____

_____

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐  Returned unexecuted: _____

_____

_____

☐  Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
|  |  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                        Date                                *Signature of Server*

                                            _____
                                            *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

Hearing Date: 6/27/2023 9:15 AM
Location: Court Room 2508
Judge: Gamrath, Celia G

**12-Person Jury**

FILED
2/24/2023 6:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH01872
Calendar, 6
21622998

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

**CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

MICHAEL BLAKE, individually and on behalf of similarly situated individuals,

  *Plaintiff,*

   v.

CELEBRITY HOME LOANS, LLC, an Illinois limited liability company; and CELEBRITY FINANCIAL, INC., a U.S. Virgin Islands corporation,

  *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.   **2023CH01872**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff, Michael Blake, by and through his undersigned attorneys, brings this Class Action Complaint against Defendants, Celebrity Home Loans, LLC and Celebrity Financial, Inc. (collectively, "Celebrity" or "Defendants"), to seek redress for Defendants' violations of the federal Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq.*, and their failure to timely pay full wages, commissions, and final compensation owed to Plaintiff and other similarly situated individuals in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.* Plaintiff alleges as follows based on personal knowledge as to his own acts and experiences, and as to all other matters, upon information and belief, including an investigation by his attorneys.

## NATURE OF THE ACTION

1. This case arises out of Celebrity's callous decision to abruptly terminate hundreds of its employees without providing them with 60-days advance notice as required by the federal WARN Act, or timely payment of their full wages, commissions, and final compensation as

1

FILED DATE: 2/24/2023 6:57 PM 2023CH01872

required by the IWPCA.

2.      On February 13, 2023—just three days prior to many employees' payday—Celebrity sent separation letters to approximately 92% of its workforce, informing them that they were being terminated that same day. Making matters worse, the letters also told employees that they would not be receiving timely compensation for the pay period prior to termination. For many, the outstanding pay included salaries, wages, and commissions earned during the entire month of January and first half of February. Nor would separated employees be receiving timely payment for accrued vacation time and other final compensation owed at the time of separation.

3.      Celebrity's actions are not only unlawful under state and federal law, they are also unethical, unscrupulous, and have caused substantial harm to its many employees. Celebrity's sudden mass layoff is inconsistent with industry best-practices and lacks basic consideration for its employees.

4.      As a result of Celebrity's failure to comply with the provisions of the WARN Act and the IWPCA, Plaintiff and Celebrity's other employees were denied their statutory right to formal notice as to when a mass layoff would occur. Celebrity's announcement that its employees were being terminated came without adequate advance warning and caused substantial disruption in the lives of Plaintiff and Celebrity's other employees.

5.      Accordingly, Plaintiff brings this action to redress these harms and hold Celebrity accountable for violating the putative class members' rights under the WARN Act and the IWPCA. On his own behalf and on behalf of two classes of similarly situated individuals defined below, Plaintiff seeks recovery of all available actual, compensatory, and statutory damages, pre-judgment interest, as well as costs and reasonable attorneys' fees.

**PARTIES**

6.     Plaintiff, Michael Blake, is a natural person and at all relevant times has been resident of Illinois.

7.     Defendant Celebrity Home Loans, LLC ("CHL") is a limited liability company organized under the laws of Illinois and headquartered in Oakbrook Terrace, Illinois. CHL conducts business in Cook County, Illinois and elsewhere nationwide. CHL is a subsidiary of Defendant Celebrity Financial, Inc.

8.     Defendant Celebrity Financial, Inc. ("CFI") is a for-profit corporation incorporated under the laws of the U.S. Virgin Islands and headquartered in St. Thomas, Virgin Islands. CFI is a managing member, parent, and owner of Defendant CHL. CFI maintains a substantial presence in Illinois, and a number of its high-level officers and employees live and work in Illinois.

9.     At all times relevant to the claims in this matter, Defendant CFI managed and exercised complete control over its subsidiary, Defendant CHL, which acted as an agent on behalf of and within the course and scope of its agency with CFI.

10.     Further, CFI was directly and actively engaged with CHL's management, such that it had a hands-on role with CHL's high-level policies and procedures and its daily operations. Indeed, CFI installed a number of its own directors and executives in key positions at CHL. For example, David Robnett, the Chairman and CEO of CFI, is also the CEO and a managing member of CHL. Scotty Pickle, the SVP of Finance at CFI, is also the CFO at CHL. Given the substantial overlap between the two entities, CFI and CHL shared joint authority over matters relating to the essential terms and conditions of the putative class members' employment, including decisions related to hiring and firing and employee compensation.

11.     In short, CFI held complete control over the operation of CHL and installed its own

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

FILED DATE: 2/24/2023 6:57 PM   2023CH01672

directors and executives at CHL, including those in charge of daily operations, like staffing.

## JURISDICTION AND VENUE

12.     Pursuant to 735 ILCS 5/2-209(b), this Court has personal jurisdiction over Defendant CHL with respect to Plaintiff's and the other putative class members' claims, because CHL is organized under the laws of this state and headquartered within this state.

13.     This Court also has personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209(a), because Plaintiff's and the putative class members' claims arise out of or relate to Defendants' unlawful in-state actions, namely, Defendants' implementation of an unlawful mass layoff and their decision to unlawfully withhold commissions, wages, and final compensation owed to Plaintiff and the other putative class members. Further, Defendants are doing business within this state such that they have sufficient minimum contacts with Illinois and have purposefully availed themselves of Illinois markets to make it reasonable under the Illinois Constitution and Constitution of the United States for this Court to exercise personal jurisdiction over Defendants.

14.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, because CHL maintains offices in Cook County and is doing business in Cook County, and thus resides in Cook County under 735 ILCS 5/2-102.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

### *Background*

15.     Defendant CHL, formerly known as Midwest Equity Mortgage, is a home mortgage lender based in Oakbrook Terrace, Illinois.

16.     Since its inception in 2006, CHL has lent over $21 billion in home loans.[1] CHL

---

[1] https://celebrityhomeloans.com/about

reported approximately $5.9 billion in total mortgage origination volume for the 12 months ending December 1, 2022.

17.     CHL is a subsidiary of CFI, and together they are licensed and jointly operate in at least 46 states under various brands and trade names.

18.     In order to promote loans to prospective home buyers and other borrowers, Defendants jointly employed more than 300[2] loan officers, as well as numerous employees in other roles such as underwriters, processors, and administrative staff.

19.     Defendants' loan officers, like Plaintiff, were primarily compensated through a baseline hourly wage plus commissions on loans they closed. The amount of the commissions depended on a number of factors such as number of loans closed, loan size, and the loans' interest rates. Commissions were generally paid on the 16th day each month.

*Celebrity's Mass Layoffs*

20.     On or about February 7, 2023, Defendants held a conference call with employees, during which they announced an acquisition by On Q Financial, Inc. ("On Q"), an Arizona-based mortgage lender. The terms of the acquisition were not disclosed, but it purportedly involved On Q acquiring some or all of CHL's assets and production divisions.

21.     To the surprise of many employees, Defendants also revealed during the same February 7, 2023 conference call that they would be furloughing approximately 75% of their staff that same day, with no date set for reinstatement. This call was the first time that many employees were informed of the possibility of a mass layoff. However, Defendants gave no explanation as to why the furloughs were necessary or why they had failed to give sufficient advance notice. A subsequent email sent to some employees stated that some were being furloughed immediately,

---

[2] https://www.housingwire.com/articles/struggling-mortgage-shop-celebrity-in-ma-talks-with-on-q-financial-sources/

5

FILED DATE: 2/24/2023 6:57 PM    2023CH01872

while others would not be furloughed until February 27, 2023.

22.    On February 13, 2023, Defendants surprised their employees yet again when "separation" letters were emailed to approximately 92%[3] of Defendants' staff, informing them that they were being terminated immediately. A true and accurate copy of one such letter sent to Plaintiff is attached hereto as Exhibit 1.

23.    In the separation letters, Defendants stated that they were "notifying you [the employee] today that due to unanticipated events we must terminate your employment today (February 13, 2023) at 5pm EST."

24.    The separation letters also disclosed that the terminated employees would not be receiving timely compensation for salary, wages, commissions, or final compensation owed at the time of separation. Defendants stated that they were "unable to process our full payroll obligations on 2/16/2023. This means that [employees] will not receive compensation during this pay period. We understand the impacts this may have on you and your family, and we deeply apologize."

25.    Defendants nonetheless stated that they were "anticipating additional funds and believe this is only a timing issue with our sincere intent to provide you all compensation that is owed to you over the next several weeks."

26.    Defendants' employees were not the only ones caught off guard by the mass layoff—it was also a shock to Defendants' prospective buyer, On Q.

27.    In an interview with nationalmortgageprofessional.com, an executive at On Q Financial, Patrick Lamb, stated "that his company had no idea about the seemingly sudden liquidity issues that led to the furloughs and, a week later, the mass layoff by Celebrity Home Loans on Monday [February 13th], adding that On Q found out about the issues only after they

---

[3] https://nationalmortgageprofessional.com/news/celebrity-home-loans-cuts-92-its-staff

occurred."[4]

28.      Mr. Lamb further stated that "the deal to acquire some of [Celebrity]'s assets ha[d] fallen apart," because "[t]here's nothing left to acquire" following the termination of nearly all of Defendants' staff.[5]

29.      On information and belief, Defendants' representation that employees were being terminated "due to unanticipated events" was false and misleading. Defendants and their executive officers knew for weeks if not months prior to sending separation letters in February 2023 that their financial conditions and the breakdown of negotiations with On Q could lead to a mass layoff and closure of Defendants' facilities.

### *Facts Specific to Plaintiff*

30.      Plaintiff began working for Defendants as a retail loan officer and full-time employee in or about 2018.

31.      According to the terms of Plaintiff's employment agreement with Defendants, Plaintiff was to be paid an hourly wage plus commissions based on loans closed. Commissions were to be paid monthly on or about the 16th day of each month and calculated based on loans closed during the month prior. A copy of an Addendum to Plaintiff's employment agreement outlining the formula for his compensation is attached hereto as Exhibit 2.

32.      On February 13, 2023 at 7:22 p.m. CST, Plaintiff unexpectedly received a separation letter from Defendants by email informing him that his employment was being terminated as of 5pm EST that same day, and that he would not receive compensation for the pay period leading up to his termination.

---

[4] https://nationalmortgageprofessional.com/news/q-financial-celebrity-home-loans-furloughs-layoffs-sank-deal
[5] https://www.housingwire.com/articles/on-q-financial-about-celebrity-theres-nothing-left-to-acquire/

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

33.     Plaintiff did not receive any prior or subsequent written notice related to his termination other than the February 13, 2023 letter.

34.     At the time of his termination, Plaintiff had earned wages and commissions that were owed to him and scheduled to be paid on or about February 16, 2023. To date, however, Plaintiff has not received full payment of all outstanding wages and commissions. Plaintiff had also accrued paid time off and vacation days pursuant to his employment agreement for which he did not receive full payment.

35.     Plaintiff is not alone in his experiences, and hundreds of Defendants' other loan officers and other employees have had nearly identical experiences.

## CLASS ALLEGATIONS

36.     Pursuant to 735 ILCS 5/2-801, Plaintiff brings this action on his own behalf and on behalf of two classes defined as follows:

**The WARN Act Class:** All individuals who were employed by Defendants and terminated in January or February 2023.

**The IWPCA Class:** All current or former employees of Defendants who did not receive full compensation for wages, commissions, and/or other final compensation owed in February 2023 or thereafter.

37.     Excluded from the Classes are any members of the judiciary assigned to preside over this matter; any officer or director of Defendants; and any immediate family member of such officer or director.

38.     **Numerosity:** Upon information and belief, there are hundreds of members of the Classes, making the members of the Classes so numerous that joinder of all members is impracticable. Although the exact number of members of the Classes is unknown to Plaintiff, the members can easily be ascertained through Defendants' personnel records.

39.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the

8

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

Classes he seeks to represent because the factual and legal bases of Defendants' liability to Plaintiff and the other members of the Classes are the same, and because Defendants' conduct has resulted in similar injuries to Plaintiff and the other members of the Classes. As alleged herein, Plaintiff and the other members of the Classes have all suffered damages in the form of unpaid or underpaid wages, commissions, and final compensation as a result of Defendants' implementation of a mass layoff.

40.   **Commonality & Predominance:** There are many questions of law and fact common to Plaintiff and the other members of the Classes' claims, and those questions predominate over any questions that may affect individual members. Common questions for the Classes include, but are not limited to, the following:

    a.   Whether Defendants' employment agreements with their employees are enforceable under the IWPCA;

    b.   Whether Defendants owed wages and commissions to the IWPCA Class members at the time of their separation;

    c.   Whether Defendants failed to timely pay full final compensation to separated employees;

    d.   Whether Defendants' conduct violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq*.

    e.   Whether Plaintiff and the WARN Act Class suffered an "employment loss" as defined by the WARN Act;

    f.   Whether Plaintiff and the WARN Act Class were "affected employees" as defined by the WARN Act;

    g.   Whether Defendants failed to provide the notice required by the WARN Act;

    h.   Whether Defendants' conduct violated the WARN Act; and

    i.   Whether Plaintiff and the Classes are entitled to damages permitted under the WARN Act and the IWPCA.

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

41.     **Fair and Efficient Adjudication:** A class action is an appropriate method for the fair and efficient adjudication of this controversy because absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitively expensive and would have no effective remedy. Further, the class treatment of the common questions of law and fact here is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

42.     **Fair & Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes he seeks to represent.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Classes.

43.     Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making injunctive or corresponding declaratory relief appropriate for each Class as a whole.

**COUNT I**
**Violation of the federal Worker Adjustment and Retraining Notification Act**
**("WARN Act"), 29 U.S.C. § 2101 *et seq.***
**(on behalf of Plaintiff and the other members of the Class)**

44.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 - 35 as though fully set forth herein.

45.     The WARN Act generally requires that certain employers give employees 60-days advance notice of plant closings or mass layoffs.

10

FILED DATE: 2/24/2023 6:57 PM   2023CH01672

46.     Defendants are employers subject to the WARN Act under Section 2101(a)(1).

47.     The terminations effectuated in or about February 2023 constitute a "mass layoff" within the meaning of Section 2101(a)(3) the WARN Act, because they affected at least 50 full-time employees and more than 33% of Defendants' workforce.

48.     Alternatively, the closure of Defendants' Oakbrook Terrace office constitutes a "plant closing" within the meaning of the WARN Act, because it is a single site of employment, the shutdown of which resulted in the employment loss of more than 50 full-time employees.

49.     Plaintiff and the other members of the WARN Act Class are "affected employees" within the meaning of the WARN Act because, as employees of Defendants, they were reasonably expected to experience an employment loss as a result of Defendants' mass layoff and/or plant closing.

50.     Plaintiff and the other WARN Act Class members are aggrieved employees because they did not receive the 60 days advance notice of a plant closing and/or mass layoff required under Section 2102 of the WARN Act.

51.     Defendants willfully violated the WARN Act because they knew, and have known for months, that they would need to carry out a plant closing or mass layoff for financial reasons, but they did not give adequate notice of the expected or anticipated date of closure or layoffs.

52.     Pursuant to Section 2104(a) of the WARN Act, Defendants are liable to Plaintiff and the other members of the WARN Act Class for back pay and benefits in an amount to be determined at trial.

53.     WHEREFORE, Plaintiff prays for the relief set forth below.

11

FILED DATE: 2/24/2023 6:57 PM 2023CH01872

**COUNT II**
**Violation of Illinois Wage and Payment Collection Act (IWPCA), 820 ILCS 115/1, *et seq.***
**(on behalf of Plaintiff and the other members of the Class)**

54.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 -

35 as though fully set forth herein.

55.     Plaintiff and the other IWPCA Class members are "employees" as defined in the

IWPCA, and Defendants are jointly their "employer" as defined in the IWPCA. 820 ILCS 115/2.

56.     Under the IWPCA, an employer is required to pay commissions to its employees at

least monthly. *Id.* § 3.

57.     Further, employers must pay the final compensation of separated employees in

full, at the time of separation, if possible, but in no case later than the next regularly scheduled

payday for such employees. *Id.* § 5.

58.     As explained above, Defendants failed to timely pay Plaintiff and the other IWPCA

Class members all earned wages, commissions, and final compensation they were owed at the time

of their separation.

59.     Defendants have no legal basis for its refusal to pay Plaintiff and the other Class

members the compensation they have earned and which is due and owing to them. Defendants'

refusal to pay Plaintiff and the other IWPCA Class members all amounts due and owing to them

is vexatious, harassing, and in bad faith.

60.     As a direct and proximate result of Defendants' conduct and violations of the

IWPCA, Plaintiff and the other IWPCA Class members have suffered actual harm in the form of

actual monetary damages, pecuniary losses, and other harms in an amount to be proven at trial.

61.     Pursuant to Section 14(a) of the IWPCA, any employee not timely paid wages, final

compensation, or wage supplements by his or her employer shall be entitled to an award of

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

damages equal to the amount of any such underpayments along with damages of 5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid, plus an award of costs and all reasonable attorney's fees. 820 ILCS 115/14(a).

62.     WHEREFORE, Plaintiff prays for the relief set forth below.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the other members of the Classes, prays for the following relief:

A.      An order certifying the Classes proposed above and appointing Plaintiff as Class representative and the undersigned counsel as Class counsel;

B.      A declaration that Defendants violated the WARN Act and the IWPCA;

C.      An award of damages to the WARN Act Class members equal to the amount of any back pay and any benefits recoverable under Section 2104(a)(1) of the WARN Act;

D.      An award of damages to the IWPCA Class members equal to the amount of any unpaid or underpaid wages, salary, commissions, and final compensation along with damages of 5% of the amount of any such underpayments for each month during which such underpayments remain unpaid;

E.      An award of reasonable attorneys' fees, expenses, and costs;

F.      Prejudgment interest;

G.      Such preliminary and other injunctive, equitable, or declaratory relief as the Court deems appropriate; and

H.      Such further and additional relief as the Court deems reasonable and just.

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

# Exhibit 1

FILED DATE: 2/24/2023 6:57 PM    2023CH01872

February 13, 2023

Michael Blake
 @gmail.com
█████ @eclicklending.com

Dear Michael:

We are notifying you today that due to unanticipated events we must terminate your employment today (February 13, 2023) at 5pm EST.  In addition, we are unable to process our full payroll obligations on 2/16/2023.  This means that you will not receive compensation during this pay period.  We understand the impacts this may have on you and your family, and we deeply apologize.  During this period, you may qualify for a hardship withdrawal or loan from your 401k.  Please contact ADP for additional information by logging in to www.MyADP.com or calling 1-866-695-7526.

In addition, our EAP program also offers resources and programs to help you.  For more information visit www.guidanceresources.com (username LFGSupport, password LFGSupport1) or call 1-888-628-4824. We are anticipating additional funds and believe this is only a timing issue with our sincere intent to provide you all compensation that is owed to you over the next several weeks.  We would also recommend that you submit any outstanding healthcare claims as soon as possible to avoid any interruptions in coverage.

If you have any additional questions, please contact askhr@celebrityhomeloans.com.


Sincerely,

Celebrity Home Loans, LLC

FILED DATE: 2/24/2023 6:57 PM   2023CH01872

# Exhibit 2

# Retail Loan Officer Employment Agreement

## ADDENDUM A

Retail Loan Officer:  Michael Bernard Blake Jr          Effective Date:  February 1, 2023

| Compensation Tiers | | | Compensation Caps |
|---|---|---|---|
| Rate Table Generated Lead* | | | |
| Refinance Loan | 25 | Basis Points (min. $750) | $1,500 |
| Purchase Loan Tiers: | | | |
| 1 to 3 Units | 30 | Basis Points | $3,000 |
| 4 to 6 Units | 40 | Basis Points | $3,000 |
| 7 + Units | 50 | Basis Points | $3,000 |
| Rate Table Repeat Lead | 75 | Basis Points | $3,000 |
| Non-Rate Table Generated Lead** | | | |
| 1 - 3 Units | 50 | Basis Points | $4,000 |
| 4 - 6 Units | 75 | Basis Points | $4,000 |
| 7+ Units | 85 | Basis Points | $4,000 |
| Self-Generated/Repeat*** | 115 | Basis Points | $4,000 |
| Brokered Loan**** | 75 | Basis Points | $3,000 |

1. <u>Hourly Rate of Pay</u>: Employee will be paid the state prevailing minimum wage* per hour worked payable in semimonthly installments on or around the 1st and 16th of each month. Employee will additionally be paid any overtime worked at one and a half times his/her hourly rate of pay. Base pay will not include any overtime pay Employee receives. Employee's Base Pay will be deducted from any commissions Employee is eligible to receive that pay period pursuant to paragraph 2 below. In the event Employee's Base Pay for the pay period exceeds the Employee's commission for the pay period, any negative balance will be carried over and applied against the calculation of future commissions. Employee is not and will not be held responsible for negative balances except to the extent that his/her commissions can be reduced.  Under no circumstance, and at no time during or after employment, will Employee be required or expected to re-pay the Company beyond and/or except as per the deductions from commission described herein.

2. <u>Commission</u>: On or around the 1st and 16th of each month, Employee will be eligible to receive commissions based upon closed and funded loan production the prior month, subject to the terms of the Employment Agreement and the terms of this Addendum A.  Any commissions paid on or around the 1st will be based upon loan production closed and funded the 1st through 15th the prior month.  Any commissions paid on or around the 16th will be based upon loan production closed and funded the 16th through the end of the prior month.  Employee will be paid in commissions the basis points designated above based upon the production volume minus the Base Pay and any carry-over negative balance applicable for that pay period. Employee compensation will not vary depending on whether a loan locks or closes at, above, or below the Base Price set by Company for Employee.

3. <u>All Commission is Advanced</u>: Employee is only considered to have earned and be entitled to payment of commission on loans once they have been sold on the secondary market and the period for any early payment default and early pay off period has expired.  Notwithstanding, the Company is advancing the commission on loans once they have been closed and funded under Employee's supervision as detailed in Paragraph 2. In the event such commission is advanced, but is later deemed un-earnable as a result of failure to sell, a repurchase demand, an early payment default or early payoff period, the amounts advanced will be subtracted from Employee's net commission in calculating any unearned commission not yet paid to Employee. No payment will be advanced, nor commission paid on loans that Employee did not originate, or that were not closed while under Employee's authorized supervision. The limited exception to this is detailed in Article III of the Employment Agreement. It is understood that Employee is not entitled to commission simply for procuring a loan.

4. <u>Prospective Compensation Adjustments</u>: Employee's compensation may not be adjusted more than once in any three (3)-month period. The Company may review and, in its sole discretion, amend Employee's compensation (and alter the terms of this Addendum A) after the Employee's initial ninety (90) days of employment with Company, and then as often as once in a three (3) month period. However, the Company contemplates that as a matter of course compensation will not be adjusted that regularly absent reason.  For example, Employee's compensation will be subject to review for an adjustment

Scanned with CamScanner

# Retail Loan Officer Employment Agreement

if (i) s/he requests a compensation review; (ii) there are losses associated with epds, epos, repurchases, or unsalable loans; (iii) Employee has not met minimum production volumes; (iv) Employee is found to have breached his/her employment agreement or violated a written Company policy; or (v) the branch Employee is associated with cannot support Employee's existing compensation structure. In the event an Employee's compensation is evaluated for adjustment, a variety of criteria including pull through rate, quality of loan files, loan volume, seniority, overall sources of origination, loan performance, any relevant competitive forces impacting Employee's customer base, and any relevant macroeconomic trends will be reviewed. Notwithstanding the foregoing, the Company can adjust the compensation levels at any time in the event it determines that that it is required to do so to enable the production center to operate profitably, to comply with state and or federal requirements, or economic conditions require overall changes to compensation or pricing. In addition, Employee's commission rate can be adjusted or suspended at any time if the Company has reason to believe that (i) Employee has breached his fiduciary duty or obligation to the Company; (ii) Employee has violated any law, policy, procedure or acted improperly in regard to the Company or in any transaction with a consumer; or (iii) Employee is engaged in self-dealing, acting purely in his/her own pecuniary interest without regard to and inconsistent with the interests of the Company and/or the consumer.

5.  Closed Loan: As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, all rescission periods have expired, and all proper documentation has been filed and prepared in accordance with TILA/RESPA.

6.  Piggyback Second Mortgages: Compensation is not paid on piggyback second mortgages whether the loan is funded by Company or brokered by Company. A piggyback second mortgage is a mortgage in a subordinated lien position which is consummated at the same time as the first mortgage. Due to the higher risk associated with 2nd lien loans, piggyback second mortgaged should only be originated as necessary to facilitate a better overall loan structure for the borrower. It's Company's policy to originate 1st lien loans whenever practical to do so.

7.  Disputes: Employee agrees that within 30 days of the receipt of any payment of commissions, s/he will bring to Employer's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with commissions paid. Employee understands that if no such written dispute is initiated, Employee's silence constitutes an acknowledgement that commissions were properly calculated and paid.

\* Should the applicable state's minimum wage increase, the Company will automatically adjust Employee's hourly pay rate accordingly.

**Source Definitions:**

*   A self-generated loan is defined as a loan or lead resulting from: loan officer cold calling potential customers; marketing efforts paid for by the loan officer; loan officer meeting a customer at non-Company sponsored events; referrals from real estate agents with which a loan officer has established a relationship; past client referrals of new business; and referrals from family and friends.

*   A lead-generated loan is defined as a loan resulting from Celebrity Home Loans' marketing efforts.

*   Branch Referral is defined as a loan referred into the branch and distributed to a licensed loan originator.

*   Brokered Loan is defined as any loan the CHL does not fund.

*   Return Client is refinance or purchase being completed for a past client.

*   Co-origination occurs when a loan file is completed in an arrangement between two licensed Loan Officer. Both Loan Officers must be licensed in the applicable state the property resides in.

**Signature:** *mike blake*
mike blake (Feb 1, 2023 08:24 CST)

**Email:** ▓▓▓▓@eclicklending.com

**Signature:** ⟋⟋⟍

**Email:** tony@midwestequity.com